1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE WESTERN DISTRICT OF OKLAHOMA

 3

 4   JOHN ALBERT BOLTZ,

 5           Plaintiff,

 6   vs.                         Case No. CIV-06-587-F

 7   JUSTIN JONES, et al.,

 8           Defendants.

 9   ----------------------------

10

11

12

13

14

15       TRANSCRIPT OF MOTION FOR TEMPORARY RESTRAINING ORDER

16           BEFORE THE HONORABLE STEPHEN P. FRIOT

17               UNITED STATES DISTRICT JUDGE

18                     JUNE 1, 2006

19

20

21

22

23

24

25
```

```
1                          APPEARANCES

2    FOR THE PLAINTIFF:            Mr. James Hankins
                                   Coyle Law Firm
3                                  119 N. Robinson Avenue
                                   Suite 320
4                                  Oklahoma City, OK 73102

5    FOR THE AMICI:                Ms. Lisa McCalmont
                                   U.S. Federal Public Defender
6                                  200 N.W. 4th Street
                                   Oklahoma City, OK 73102
7

8    FOR THE DEFENDANTS:           Mr. Preston Draper
                                   Attorney General's Office
9                                  2300 N. Lincoln Blvd.
                                   Suite 112
10                                 Oklahoma City, OK 73105

11                                 Mr. Richard Mann
                                   Attorney General's Office
12                                 4545 N. Lincoln Blvd.
                                   Suite 260
13                                 Oklahoma City, OK 73105

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1          THE COURT:  We're here in Civil 06-587, John Albert
 2   Boltz versus Justin Jones, and others, and specifically on the
 3   plaintiff's motion for a temporary restraining order and/or
 4   permanent injunction.  Counsel will please give your
 5   appearances.
 6          MR. HANKINS:  James Hankins for Plaintiff John Boltz.
 7          MR. DRAPER:  Preston Draper and with me is Richard
 8   Mann, Assistant Attorney General.
 9          THE COURT:  Thank you.  Give me just a moment,
10   Counsel, to get organized.
11          MR. HANKINS:  Judge, pursuant to our --
12          THE COURT:  Excuse me, Counsel, just stand by.  Now,
13   Mr. Hankins, as you were about to say.
14          MR. HANKINS:  Your Honor, pursuant to our
15   conversation we had in chambers, I would ask the Court's
16   permission for Ms. McCalmont to enter an appearance as amicus
17   counsel in this case, if that's acceptable.
18          THE COURT:  Amicus counsel, I'm not quite sure I
19   understand that category.  She can certainly -- as I mentioned
20   in our brief conference with you and Mr. Draper in chambers, I
21   certainly have no problem with Ms. McCalmont's entry of
22   appearance as counsel to serve in whatever role as counsel,
23   your co-counsel or second chair counsel you would want her to
24   serve, and I will not require that the formality of the filing
25   of an entry of appearance be accomplished today, but I'm going
```

1   to have to ask you to educate me just a bit as to what you mean

2   by amicus counsel, if that's what you meant to say.

3            MR. HANKINS:  That is what I meant to say, Your

4   Honor.  Amicus counsel representing the other plaintiffs

5   similarly situated that raise the same underlying factual

6   allegations as Mr. Boltz.  I believe it is proper for her to

7   enter an appearance in this case for the limited purpose of

8   providing an overview to the Court concerning the merits of the

9   litigation, the 1983 litigation.

10            THE COURT:  Mr. Draper or Mr. Mann, do the defendants

11   object to this request?

12            MR. DRAPER:  Yes, Your Honor.  I think she should

13   appear as counsel for Mr. Boltz or not appear at this hearing.

14            THE COURT:  Mr. Hankins, is it proposed that

15   Mr. Anderson be permitted to participate in this case as an

16   amicus represented by counsel, Ms. McCalmont?

17            MR. HANKINS:  Correct.

18            THE COURT:  Okay.  Ms. McCalmont, do you on behalf of

19   Mr. Anderson move to be heard on behalf of Mr. Anderson with

20   Mr. Anderson as the amicus?

21            MS. McCALMONT:  Yes, Your Honor.

22            THE COURT:  Pardon me?

23            MS. McCALMONT:  Yes, Your Honor.

24            THE COURT:  I need counsel for the defendants at the

25   lectern for just a moment.

1      Mr. Draper, obviously, this case is closely related in

2  some important respects to the Anderson case, which has been

3  pending in this Court for some time.  Without precluding

4  consideration by this judge today as to exactly what we will

5  get into with any presentations by Ms. McCalmont on behalf of

6  the amicus, Mr. Anderson, it strikes me that it would not be,

7  under the circumstances, an extraordinary thing, at least, to

8  afford Ms. McCalmont the opportunity to appear on behalf of

9  Mr. Anderson as an amicus.  Again, without foreclosing

10  consideration of the extent to which these proceedings would be

11  protracted by matters presented by Ms. McCalmont.

12      What says the state about that?

13      MR. DRAPER:  Your Honor, I would still object to

14  that.  I believe that due to the unique circumstances of this

15  particular case, where the state's position is that this case

16  is not in fact similar to the case that is currently pending

17  before the Court with Mr. Anderson at all, that we would still

18  object because basically we're here on a motion for temporary

19  restraining order for Mr. Boltz and not as to, you know, really

20  the substance of the issue that if this Court granted the

21  restraining order then maybe the motion to appear as amicus

22  would be proper at that time.  I don't think it's proper at

23  this time, though.

24      THE COURT:  Thank you.

25      MR. DRAPER:  Thank you, Your Honor.

1          THE COURT:  Ms. McCalmont, you represent Glen

2  Anderson and Charles Taylor in Civil 05-825; is that correct?

3          MS. McCALMONT:  Yes, Your Honor.

4          THE COURT:  And is it on their behalf that you move

5  for an order permitting them to appear in this case as amici

6  and permitting you to appear as their counsel?

7          MS. McCALMONT:  Yes, Your Honor.

8          THE COURT:  That will be granted.

9          MS. McCALMONT:  Thank you.

10          THE COURT:  You may come forward.  I want to inquire

11  first, and perhaps logically this would involve inquiry first

12  of counsel for the defendants, as I want to get some notion as

13  to the areas of factual dispute in this matter.  And, Mr. Mann

14  or Mr. Draper, either one, you're invited to the lectern so

15  that I may make inquiry as to the matters that are in dispute.

16      I can speculate as to what matters may be in dispute, but

17  that obviously is not a good basis upon which to proceed.  So

18  let me cover a few points with you, Mr. Draper, and you can

19  educate me as to the matters which from the defendant's

20  perspective are in dispute.

21      And I have taken judicial notice, by the way, of some

22  background in the case as reported at 806 P.2d 1117, Boltz v.

23  State, the opinion of the Oklahoma Court of Criminal Appeals on

24  direct appeal handed down on January 7, 1991.  So I do have

25  some understanding of the background of the matter.

1    It does appear, but I want you to set me straight if I'm

2  incorrect, Mr. Draper, that the plaintiff is John Albert

3  Boltz.  He is a prisoner under a sentence of death imposed by

4  the State of Oklahoma, he is in the custody of at least one of

5  the defendants, and that the execution date is today.  What is

6  the appointed execution hour?

7         MR. DRAPER:  The hour is six o'clock p.m., Your

8  Honor.

9         THE COURT:  Okay.  Six o'clock today.  The materials

10  before the Court further indicate that the method by which the

11  execution would be accomplished would be lethal injection

12  consisting of the sequence described at the Department of

13  Corrections website which consists of the sequential injection

14  of sodium -- is it thiopental?  Is that the correct

15  pronunciation?

16         MR. DRAPER:  I believe so, Your Honor.

17         THE COURT:  Sodium thiopental, vecuronium bromide.

18  Is that the right pronunciation?

19         MR. DRAPER:  Yes, sir.

20         THE COURT:  And potassium chloride, each of which is

21  intended to have a different effect on the prisoner, but which

22  collectively constitute the substances which are intravenously

23  through two venal openings injected into the prisoner for the

24  purpose of carrying out the sentence of death.  Are we together

25  so far?

1          MR. DRAPER:  Yes, Your Honor.

2          THE COURT:  Okay.  And it's further asserted, now

3   this is an assertion, and I'm not asking you to agree with the

4   underlying substance of the assertion, but it's further

5   asserted that the method of lethal injection proposed to be

6   employed by the state carries a high risk of conscious

7   suffering and pain by the condemned inmate, that the State of

8   Oklahoma has deliberately ignored or is indifferent to the

9   health and safety of the condemned prisoner in this respect in

10  violation of the Eighth and Fourteenth Amendments to the

11  Constitution, and that this is an arbitrary and capricious

12  protocol which subjects the condemned inmate to -- or exposes

13  him to avoidable pain and suffering all in violation of the

14  Eighth and Fourteenth Amendments.

15      Without in any sense requesting that the defendants

16  speaking through you to agree to the substance of that

17  allegation, are we together that that is the essential

18  allegation made on behalf of Mr. Boltz in this case?

19          MR. DRAPER:  Yes, sir, I believe that's correct.

20          THE COURT:  Very well.  And is it also true that

21  unless restrained, at six o'clock p.m. today, the Plaintiff

22  John Albert Boltz will be subjected to the implementation of

23  the sentence of death by lethal injection with the use of the

24  protocol to which the Court has made reference?

25          MR. DRAPER:  Yes, sir.

1          THE COURT:  Okay.  Bearing that in mind, then,

2   Mr. Draper, aside from the obvious disagreement by the parties

3   as to the substance of the matter in terms of the effect of the

4   protocol on the plaintiff to which I just made reference, are

5   you aware of any factual disputes in this case?  We will talk

6   about the law here in a few minutes, but are you aware -- and

7   let me carve one more thing out of that.

8          There is a rather obvious issue under Nelson v. Campbell

9   and the considerations discussed by the Supreme Court in Nelson

10  v. Campbell as to whether we have had impermissible and

11  intolerable delay in bringing this matter before the Court.  So

12  that aside, and aside from the question of the physiological

13  effect of the implementation of the protocol, are you aware of

14  any factual disputes in this matter?

15         MR. DRAPER:  Well, let me clarify just a minute,

16  Judge.  I agree that those substances that you listed will be

17  used to carry out the lethal injection, I agree that those

18  substances are intended to do the specific physiological

19  effects to bring about the death of the plaintiff, but I think

20  there probably is some dispute as to the effectiveness of those

21  drugs and the amounts that are used.

22         THE COURT:  In my pending question to you, that's

23  carved out, I recognize there is a dispute about what I'll call

24  the physiological aspect of the case.

25         MR. DRAPER:  Okay.  I misunderstood your question

1    then, Your Honor, but, yes, we agree that those drugs will be

2    used and that they are intended to bring about the death of the

3    plaintiff.

4          THE COURT:  Okay.  And so, again, carving out two

5    areas of factual controversy, number one, whether there has

6    been undue delay in bringing this case, applying the principles

7    set forth in Nelson v. Campbell and, number two, as to the

8    physiological issues asserted by the plaintiff.  Aside from

9    those matters, does the state assert that there are any factual

10   issues before the Court for resolution today?

11         MR. DRAPER:  I don't believe so, Your Honor.

12         THE COURT:  Okay.  I do appreciate that clarification

13   and that degree of candor.

14      Now, I will invite Mr. Hankins to the lectern for some

15   inquiries as a preliminary matter.

16      Mr. Hankins, of course, as an experienced practitioner,

17   and even aside from that, having read the state's well-written

18   response in this case, and aside from that, having had the

19   benefit of a brief discussion with the Court in chambers this

20   morning with Mr. Draper also present, you're aware, certainly,

21   of the decision of the United States Supreme Court in Nelson v.

22   Campbell, 541 U.S. 637.

23      The most relevant part of that opinion, at least for

24   present purposes, is the discussion of stay at pages 649 and

25   650.  And I think at least for some purposes today, the

1  plaintiff's motion for a temporary restraining order -- and by

2  the way, that's all that's before the Court today is a motion

3  for a temporary restraining order -- the plaintiff's motion for

4  temporary restraining order can for some purposes be equated to

5  a motion for a stay.  Which brings me to what I believe to be a

6  passage from the Supreme Court's opinion in Nelson v. Campbell,

7  which certainly does call for some discussion and consideration

8  today.

9       That passage reads as follows, and I'm going to leave out

10 internal quotations and citations, and on that basis this

11 passage reads as follows:  "A stay is an equitable remedy and

12 equity must take into consideration the state's strong interest

13 in proceeding with its judgment and attempts at manipulation.

14 Thus, before granting a stay, a district court must consider

15 not only the likelihood of success on the merits and the

16 relative harms to the parties, but also the extent to which the

17 inmate has delayed unnecessarily in bringing the claim.  Given

18 the state's significant interest in enforcing its criminal

19 judgments, there is a strong equitable presumption against the

20 grant of a stay where a claim could have been brought at such a

21 time as to allow consideration of the merits without requiring

22 entry of a stay."

23      That's from pages 649 and 650 of the Supreme Court's

24 opinion in Nelson v. Campbell appearing at Volume 541 of the

25 United States Reports.

1    Viewing the matter in light of that rather unequivocal

2 language by the Supreme Court and in which the Court spoke

3 unanimously, Mr. Hankins, and viewing the matter also in light

4 of the fact that the state asserts that the matter you now seek

5 to bring before the Court at the eleventh hour could have been

6 litigated more than ten years ago, I need you to explain to the

7 Court why these considerations as were fairly unequivocally

8 articulated in Nelson v. Campbell should not be dispositive of

9 your motion today.

10    MR. HANKINS:  I believe three reasons, Your Honor.

11 The first one is I don't believe any other death row inmate, as

12 far as I'm aware, has ever been affirmatively denied counsel,

13 compensated counsel to assist that inmate in pursuing a civil

14 rights claim, a 1983 action, and I think that's a key

15 distinction in this case.  I mean, I'm basically here -- not

16 basically, I am here in a pro bono capacity.  I have

17 represented Mr. Boltz since 1999 through specific appointment

18 under a specific statute, 848(q), which has certain delineated

19 limitations.

20    Some of those limitations state clemency, for example, are

21 subject to sharp division even in the Court of Appeals.

22 There's a Circuit split on that.  Our Circuit allows it,

23 compensated appointed counsel in state matters.  It's an open

24 question.

25    THE COURT:  Was that the case from Judge Kerns'

1  court?

2       MR. HANKINS:  Yes, Your Honor, the Hain case.  And

3  that was a non-bond decision from the Circuit.  It is an

4  unanswered question whether my portfolio as appointed counsel

5  pursuant to the appointment covers not only payment for me, but

6  experts, litigation support, the things necessary to prosecute

7  an action, a civil rights action such as this that takes a lot

8  of time and a lot of effort.

9       Over a month and a half ago I sought an answer to that

10  question in this Court, not before Your Honor, but before a

11  different judge, Judge Miles-LaGrange, who denied -- who

12  handled the initial habeas action.  And she informed me and I

13  have attached a copy of the order that compensation or

14  appointment of counsel in this action for Mr. Boltz is

15  unauthorized under the statute and that is what is -- and that

16  is the issue that I've appealed in the Circuit and that is --

17  and I know there's going to be discussion here of the Circuit

18  opinion denying a stay pending that appeal.  That is the only

19  thing that appeal is concerning, the scope of the appointment

20  of counsel to be compensated and to have expert and litigation

21  support to prosecute cases such as this civil rights case.

22       THE COURT:  Well, how long have you represented

23  Mr. Boltz?

24       MR. HANKINS:  Since 1999 in the initial federal

25  habeas action, about seven years.

1    The second consideration, and I think this is a critical

2  distinction from Nelson, is that I was aware of the Anderson

3  and the Taylor case and Mr. Boltz was as well, so Mr. Boltz is

4  affirmatively denied the help of a lawyer in formulating a

5  federal civil rights claim.  And also there is a pending claim

6  by two other similarly situated inmates raising identical

7  issues who are being represented by federally funded counsel in

8  the federal public defender's office and that's Ms. McCalmont,

9  she's present today.

10    And that litigation was began -- I believe began about a

11  year ago.  That was filed last July.  And at that point there

12  was nothing pressing.  I mean, Boltz is sitting there without a

13  lawyer.  Other inmates are pursuing this.  You know, could he

14  have done something pro se?  I'm sure he could have.  Could I

15  have maybe done something in a pro bono capacity?  Of course,

16  you can always do that.  There's nothing prohibiting it.

17    But as far as the equities go, when you have district

18  court saying that I'm unauthorized to do this or at least get

19  paid and to get support to prosecute it in a professional

20  manner and you have another case that is being prosecuted in a

21  professional manner that has a scheduling order that is

22  proceeding orderly and you don't have an execution date, I

23  think it's entirely reasonable to -- well, not only that, and

24  then you have the Hill case that's pending in the Supreme Court

25  that's probably going to be decided later this month, that may

```
1    impact the whole thing.  So there's a lot of uncertainties and
2    there's some legal impediments to Boltz prosecuting this
3    action.
4        And the other thing is the direct appeal was decided in
5    1999.  Part of the --
6            THE COURT:  I have a 1991 --
7            MR. HANKINS:  I misspoke, Your Honor, it's 1991.
8    Part of the factual basis for this claim, probably one of the
9    key points of fact is the LaFevers execution and that occurred
10   January 30th of 2001.  So there is at least a progression of
11   factual development that resulted in at least part of a
12   reasonable delay here.
13           THE COURT:  Well, so if we go back a little over five
14   years, that was when the LaFevers execution took place,
15   correct?
16           MR. HANKINS:  Correct.
17           THE COURT:  And you rely on that to some degree in
18   support of your contentions as to the physiological effect of
19   lethal injection?
20           MR. HANKINS:  That's correct.
21           THE COURT:  Well, as an aside, and at this point it
22   certainly is an aside, was not the protocol revised in 2003?
23           MR. HANKINS:  I think I can get an answer to that.
24   Can I consult?
25           THE COURT:  Well, no, that's neither here nor there
```

1  at the moment.  But, anyway, at the time of the LaFevers

2  execution, you represented Mr. Boltz?

3          MR. HANKINS:  Correct.

4          THE COURT:  And that was a little over five years

5  ago?

6          MR. HANKINS:  That's correct.

7          THE COURT:  And obviously the prospects for ultimate

8  relief from capital punishment in this case were becoming

9  progressively more dim; is that fair?

10          MR. HANKINS:  Yes, Your Honor.

11          THE COURT:  So why were you not before this Court

12  approximately four to five years ago?

13          MR. HANKINS:  Well, I was really not aware of the

14  specific factual nature to accumulate the facts to go forward

15  with filing a complaint in this matter.  You know, to draft and

16  file a civil rights action attacking this procedure, it

17  requires a very large amount of time and effort of

18  investigating the facts.  The appointment under the statute at

19  that time was even more confined because, you know, basically

20  my understanding and the cases was I'm to represent Mr. Boltz

21  in federal habeas corpus actions only and appeals therefrom.

22      There was certainly no -- at that time I think there was

23  clear authority that even state clemency was non-compensable.

24  Other actions certainly like civil rights actions would clearly

25  have been unauthorized.

1        I believe the Tenth Circuit's opinion in Hain opened the

2    door a little bit as a more expansive reading of the statute of

3    what the duties are, and that's one of the reasons why I filed

4    a motion and requested authorization from Judge LaGrange.  But

5    it's not just something you just file.  You have to have a

6    good-faith basis and a feeling that there is merit to it.

7        And I believe the Anderson and the -- I believe at that

8    point we -- and I say we, the defense community had developed

9    enough of an evidentiary basis to go ahead and file the claim.

10   And at that point it had been filed.  So, like I said, you

11   know, Mr. Boltz is sitting in prison without a lawyer to help

12   him on this and there is -- the issue is being actively

13   litigated at that point.

14            THE COURT:  Thank you.  Anything further on this

15   point?

16            MR. HANKINS:  No, Your Honor.

17            THE COURT:  Okay.  I'm going to hear now from counsel

18   for the defendants on this preliminary issue of the application

19   of the principles articulated as I have quoted them from Nelson

20   v. Campbell.  Mr. Draper.

21            MR. DRAPER:  Yes, sir.  Well, I would first note, as

22   the Court has noted, that Mr. Hankins has been appointed in

23   this case since 1999.  That's seven years.  A prisoner's civil

24   rights claim does not -- is not bound up by the orderly

25   procession of habeas cases.  So Mr. Hankins was not -- did not

1   have to wait for his habeas cases to finish up before he could

2   file a 1983 action, if he chose to do so.

3       We know that Mr. LaFevers' execution was in 2001.  And to

4   whatever extent that that gave counsel notice, that was five

5   and a half years ago almost.  We know that the action which

6   you've allowed to come in as amicus today for Mr. Anderson, et

7   al., was filed in July of 2005.  That could have given notice.

8       Mr. Hankins sought permission for funding to be funded to

9   file in 1983 in front of Judge Miles-LaGrange in April.  He

10  waited a couple of weeks after the -- after the date of

11  execution had been given before making that motion.  That

12  motion was denied on April 28th.

13      THE COURT:  Now, say that again.  I'm not sure I

14  understood that last point.  Say that again, please.

15      MR. DRAPER:  The Court of Criminal Appeals presented

16  a date, an execution date on April 11th of this year.

17  Mr. Hankins waited a week or so before asking to be appointed

18  to do a 1983 action in front of Judge Miles-LaGrange.

19      Judge Miles-LaGrange --

20      THE COURT:  So sometime in the neighborhood of the

21  18th to the 20th of April, or thereabouts, Mr. Hankins took

22  that action which resulted in the filing of the case that was

23  heard by Judge Miles-LaGrange; is that right?

24      MR. DRAPER:  Yes, Your Honor.

25      THE COURT:  Okay.

1          MR. DRAPER:  And the state's position would be that

2     the Supreme Court denying cert in Mr. Boltz's case occurred on

3     March 27th of this year.  The state filed a motion for setting

4     an execution date that day and served Mr. Hankins, as counsel

5     for the defendant, with that on March 27th.  So he knew at

6     least March 27th that this was coming.

7        After Judge Miles-LaGrange denied his request to be

8     appointed to file a 1983, instead of immediately appealing to

9     the Tenth Circuit, which he could have done, he waited until

10    May 24th to appeal that action, nearly a month.

11          THE COURT:  So cert was denied --

12          MR. DRAPER:  Cert was denied March 27, 2006.

13          THE COURT:  Okay.

14          MR. DRAPER:  I'm sure this Court is aware that many,

15    many, many prisoners file prisoner civil rights complaints pro

16    se every day.  There's nothing in the -- nothing that suggests

17    that Mr. Boltz was incapable of filing a pro se civil rights

18    complaint stating that he thought that lethal injection was

19    somehow unconstitutional from the time that his conviction

20    became final with the denial of cert in the Supreme Court in

21    1991 until today.

22       Mr. Hankins has actually filed an action pro bono.

23    There's nothing that would have stopped Mr. Hankins from filing

24    that pro bono on April 28th when he found out that he was not

25    going to be appointed by Judge Miles-LaGrange to do that.  And

1    in its order from the appeal of that denial, the Tenth Circuit

2    basically said as much.  Said that there has been nothing to

3    stop Mr. Boltz from filing this action pro se or pro bono since

4    he could have known about it, which certainly was more than two

5    days ago.  And the state's position is it's as much as 15 years

6    ago.

7         And because of all of that, in light of the clear language

8    of Nelson, which deals precisely with this issue, where we have

9    a defendant who has an execution date set and in a dilatory

10   manner files a very last-minute, eleventh hour as they call it,

11   1983 action to challenge the method of lethal injection, I

12   suggest that Nelson absolutely controls in this situation.

13        It doesn't matter what the merits of a claim may be, the

14   fact that you knew about it and are filing it within days of a

15   set execution date makes it dilatory and makes it improper to

16   grant any sort of equitable relief to a petitioner in that

17   status.

18        THE COURT:  Thank you.  I'm going to make a

19   determination as to the Nelson v. Campbell considerations only

20   after we have addressed some other matters, because my

21   consideration of those matters may in fact -- of the Nelson v.

22   Campbell issue may in fact be influenced by other matters that

23   are said here today.  So that is very much a live issue.  It

24   may be dispositive, but it is not to be resolved quite yet.

25        I next want to hear from counsel, and I think logically

1   perhaps I should hear first from counsel for the defendants, as

2   to the standard to be applied aside from -- and this is a

3   rather significant carve out, if you will -- aside from the

4   considerations expressed by the Supreme Court in Nelson v.

5   Campbell.

6          I'm going to give you my preface and then I'll hear from

7   you.  I need to hear from counsel for the defendants and then

8   from counsel for the plaintiff as to the standard which ought

9   to govern today's application for a temporary restraining

10  order.  I'll give you my beginning point and then counsel will

11  be invited to set me straight if it should appear that I'm

12  headed in the wrong direction.

13         We do have a long line of Tenth Circuit cases which I

14  believe trace back to an even older U.S. Supreme Court case

15  that establish under certain circumstances what I will describe

16  as a relaxed standard or a more lenient standard for

17  provisional relief in some situations.  Neither counsel for the

18  plaintiff nor counsel for the defendant have cited to or quoted

19  from the relevant authorities, but it's my duty to follow the

20  law regardless of whether counsel cite the law to me that they

21  might have cited.

22         But relying on a pretty good long line of Tenth Circuit

23  cases, some of which are collected in Section 65.31 of Moore's

24  Federal Practice, we have what appears to the Court to be a

25  useful -- again, subject to the Nelson v. Campbell

1    considerations -- a useful context in which the standard for a

2    grant of provisional relief ought to be discussed in this

3    case.

4         The plaintiff is certainly required to show that he will

5    suffer irreparable injury unless provisional relief is

6    granted.  He must show that the threatened injury outweighs

7    whatever damage the proposed grant of provisional relief may

8    cause the opposing party.  He must show that the grant of

9    provisional relief would not be adverse to the public

10   interest.  And subject, again, to the additional considerations

11   I'm about to mention, he must show that there is a substantial

12   likelihood that he will prevail on the merits.

13        However, from one perspective, here is the rub.  If the

14   moving party satisfies the first three elements, the standard

15   for meeting the fourth requirement, namely, the likelihood of

16   success on the merits, generally becomes more lenient.  In such

17   a case the party seeking provisional relief in the form of a

18   temporary restraining order need only show that the issues are

19   so serious, substantial, difficult, and doubtful as to make

20   them a fair ground for litigation.  And that language goes back

21   a good many years in both the TRO context and the preliminary

22   injunction context.

23        I vividly recall a case in which a three-judge court in

24   which the presiding judge was Judge Holloway, a three-judge

25   district court in which the presiding Circuit judge, under the

1   then existing procedures was Judge Holloway, gave me an

2   injunction seemingly only because of this more lenient

3   standard, an injunction that was later reversed on the merits

4   by the United States Supreme Court.  So I was certainly just a

5   bit concerned that neither side addressed the applicability of

6   that noticeably more lenient standard.

7       The reason that it was of concern to me is that we do

8   have -- and I do recognize that we cannot regard the protocol

9   before the Court in this case as being the same that's applied

10  in every state, but we do have a good many cases around the

11  country in which challenges bearing some similarity to the

12  challenge in this case are pending, all of which, subject to

13  advocacy on the part of the lawyers in this case, tends to

14  point in the direction of the presence of a serious,

15  substantial, and difficult issue which may be a fair ground for

16  litigation, which in turn satisfies what the Court of Appeals

17  has articulated as being a more lenient approach to the Court's

18  analysis of whether the fourth requirement for provisional

19  relief has been satisfied.

20      Viewing the matter in that light, and again recognizing

21  that Nelson v. Campbell is potentially an overriding -- it

22  gives us potentially some overriding considerations.  So

23  carving that out for the moment, I will first invite counsel

24  for the defendants to set me straight if it appears I'm headed

25  in the wrong direction for reasons other than Nelson v.

1    Campbell as to the standard to be applied here today.

2           MR. DRAPER:   Thank you, Your Honor.   Let me directly

3    address your question of why the state didn't address those

4    things.   It's because the state's position is that Nelson v.

5    Campbell is a super standard and these particular cases where a

6    1983 action is brought at the last minute by a death row

7    inmate.

8           The other law that you're talking about, I believe, is

9    general law for equitable situations for whatever harm that any

10   particular plaintiff claims to be facing.   And for that reason,

11   you know, the state focused on Nelson v. Campbell.

12          There's a second reason, and it's sort of a quasi law of

13   the case reason in that basically this identical claim has been

14   presented last week to the Tenth Circuit.   I provided the Court

15   with a copy of the Tenth Circuit's order in that case.   And the

16   Tenth Circuit, contrary to what Mr. Hankins suggested, did not

17   stop at just the issue of the appeal for being appointed as

18   counsel.   But they went on recognizing the very late time that

19   we have here with the looming execution date and said that

20   looking at the merits of the 1983 case, acknowledging that they

21   did not have the specifics of that case before them, that there

22   was, "Boltz has not demonstrated a likelihood of success on the

23   merits."   And that's from page 8 of the Tenth Circuit's order

24   of May 30th.   And also that "there is the doubtful nature of

25   the ultimate question Boltz would assertedly raise whether the

1   lethal injection procedure he faces is constitutionally

2   impermissible."  That's also from page 8 of that May 30th

3   order.

4       In light of the Tenth Circuit's belief that this claim

5   would likely not succeed on the merits, in light of the clear

6   harm --

7           THE COURT:  Now, I'm looking at page 6 of the amended

8   order from the Tenth Circuit filed on May 30th and they talk

9   about likelihood of success on the merits of the appeal that

10  was before the Court in that case.

11          MR. DRAPER:  Yes, sir.

12          THE COURT:  Okay.  And then they go on over on page 7

13  at the bottom of page 7 to say Boltz has not demonstrated a

14  likelihood of success on the merits in part because of the

15  highly speculative nature of the matter, which in the

16  immediately preceding paragraph they somewhat pejoratively

17  refer to as the postulated Section 1983 action yet to be filed,

18  which tells me that at least to some degree the courts -- and

19  then again at the end of the opinion they talk about a

20  speculative and belated Section 1983 claim he now indicates he

21  may file, all of which leads me to believe that although the

22  belatedness issue is certainly there, to the extent that the

23  Court relied upon "the highly speculative nature of the

24  matter," they were making that point on the basis of their very

25  correct observation that this postulated Section 1983 action

1    had not yet been filed.  Am I reading that wrong?

2          MR. DRAPER:  That the Tenth Circuit is making its

3    order despite not having a 1983 action filed?

4          THE COURT:  No.  No.  I read the Tenth Circuit's

5    amended order as relying on two essential bases for its

6    conclusion of a lack of likelihood of success on the merits.

7    Number one, the belated nature of the action and, number two,

8    the fact that the 1983 action was not yet even on file.  So it

9    was a postulated, as they call it, a postulated Section 1983

10   action yet to be filed, which in turn made it highly

11   speculative.

12         MR. DRAPER:  Yes, Your Honor.  And I think I

13   understand what you're saying, but I suggest that the other

14   language which I read to you that they find -- they assume that

15   Mr. Boltz is going to raise a claim that lethal injection is

16   unconstitutional, knowing -- I mean, assuming that that is a

17   claim he was going to raise, which we know for a fact is what

18   he has raised.

19        The Tenth Circuit said that is a doubtful question whether

20   lethal injection is constitutionally impermissible.  And my

21   position is that the Tenth Circuit said we're going to assume

22   he's going to bring this case, we're going to assume that he's

23   going to raise that question, knowing that question, that

24   question is highly speculative, we don't believe that it really

25   -- we believe that that question is doubtful in nature and that

1   he would -- there is no -- I can't remember -- a substantial

2   likelihood that he's going to prevail on the merits.  And so I

3   would suggest that that should help to formulate this Court's

4   consideration now that this Court does have Mr. Boltz's 1983

5   filing in front of it, but I would suggest --

6           THE COURT:  Well, the Tenth Circuit -- does it not

7   appear to you that the Tenth Circuit really didn't touch the

8   underlying factual merits of the lethal injection challenge?

9           MR. DRAPER:  No, that's right.  They don't know what

10  the underlying specific challenges Mr. Boltz brings are.  Of

11  course, I go back to this.  I believe the Tenth Circuit

12  believes that Nelson absolutely controls and that dilatory

13  nature of this filing means that he does not get a stay, end of

14  story.  It doesn't matter what the other things are.

15      But Your Honor talked about the idea that there's a

16  relaxed standard if you prove the other three.  Well, I say

17  that Mr. Boltz has in no way shown that the harm to him

18  outweighs the harm to the opposing party, meaning the State of

19  Oklahoma, or to the public interest, the entire populous of the

20  state of Oklahoma.

21      The Tenth Circuit in its May 30, 2006, order on page 9

22  said it very well.  It said that the harm that Boltz will face

23  by being executed as scheduled is "counter-balanced by the

24  state's interest in timely carrying out its final criminal

25  judgments and the public's interest in a criminal justice

1   system that works as prescribed by its elected representatives

2   without manipulative disruption by defendants raising eleventh

3   hour claims.  And it cites Nelson in its analysis of that

4   statement.  And the state's position is if there is ever a

5   manipulation of the system with the dilatory filing, it's

6   Mr. Boltz's.

7        He has had all sorts of notice.  The state maintains that

8   he could have filed a 1983 action 15 years ago.  But earlier I

9   walked the Court through different dates that also set off

10  times to file his 1983 action.  And when we look at his

11  dilatory nature, I think that this Court has no choice but to

12  deny the temporary restraining order.

13           THE COURT:  Viewing the matter in that light, where

14  are we -- and recognizing the narrowness of the request for

15  relief and recognizing that the narrowness of that request for

16  relief is intentional lest the request for relief be deemed a

17  successive habeas petition.

18           MR. DRAPER:  Yes, Your Honor.

19           THE COURT:  Where are we if taking into account the

20  showing which may be made the Court does not restrain execution

21  but restrains execution using the challenged protocol?

22           MR. DRAPER:  Well, on the statutes in Oklahoma, if

23  lethal injection has been -- as the statute says, if lethal

24  injection is found unconstitutional, then electrocution will be

25  the means of execution, you know.  I mean, I am not sure what

```
 1  the -- I mean, I can tell you what the state's position will
 2  be.
 3          THE COURT:  Well, the protocol that's challenged in
 4  this case is not spelled out statutorily, is it?
 5          MR. DRAPER:  I believe that it's -- I believe the
 6  protocol itself is developed by DOC through DOC policy.  The
 7  overriding idea of how lethal injection should occur is in the
 8  statute.
 9          THE COURT:  Lethal injection per se is a statutory
10  method.
11          MR. DRAPER:  Yes.
12          THE COURT:  And it is the preferred statutory
13  method.
14          MR. DRAPER:  Yes.
15          THE COURT:  But it's my understanding that the
16  statute does not, beyond that, spell out the protocol to be
17  used.  Is that correct?
18          MR. DRAPER:  And I'm sorry, Your Honor, I can't --
19          MR. MANN:  That's correct, Your Honor.
20          THE COURT:  Mr. Hankins, is there any dispute about
21  that?
22          MR. HANKINS:  No, Your Honor.
23          THE COURT:  Okay.  So where are we then if I grant
24  plaintiff relief totally congruent with the relief sought in
25  the complaint and that is temporary restraint of use of the
```

1  challenged protocol without restraining execution?

2       MR. DRAPER:  The state would seek to have that order

3  overturned by the Tenth Circuit and the Supreme Court, if

4  necessary.

5       THE COURT:  So that's your way of saying you would

6  object to that?

7       MR. DRAPER:  Yes, Your Honor.

8       THE COURT:  Okay.  Anything further from the state on

9  the issue of the standard to be applied?

10      MR. DRAPER:  I don't believe so, Your Honor.

11      THE COURT:  Okay.  I'll hear from the plaintiff on

12  the issue of the standard to be applied.

13      MR. HANKINS:  Your Honor, if I may, counsel for the

14  state also brought up the dilatory issue as well.  I do have a

15  couple of other items to add to that if the Court would hear

16  that.

17      THE COURT:  Very well.

18      MR. HANKINS:  First one is the protocol and this has

19  been acknowledged by the Court just now and by the Court of

20  Criminal Appeals very recently in the Murphy case, which I

21  think was decided just last year.  It's not statutory.  It's

22  whatever DOC says.  And it's not really known to litigants who

23  want to challenge it.

24      The notice, the current protocol, and I've attached a copy

25  of Warden Mullin -- Mike Mullin, he was the warden at Oklahoma

1    State Penitentiary.  He effected an affidavit January 12, 2004,

2    in a separate litigation that outlines the protocol, and it is

3    different in material aspects from what is posted on the DOC

4    website.  It is different and detailed.  And Ms. McCalmont,

5    amicus counsel, is much more learned in that area than I am.

6         But as far as notice of filing the claim in dilatory

7    action, Mr. Boltz had access to the specific detailed

8    protocol.  I mean, talking about the amounts of the drugs,

9    things of that nature, that aren't spelled out anywhere,

10   neither in the statute nor in the DOC rules and regulations or

11   on their website.  And I've attached -- that's in the record

12   here.

13        The second thing is administrative relief.  Mr. Boltz --

14             THE COURT:  Before you move on to that, I have

15   reviewed the affidavit of Mr. Mullin.  He refers to the same

16   three chemicals.  There is a difference in that the website

17   version talks about the sequential injection of sodium

18   thiopental and then vecuronium bromide and then potassium

19   chloride, whereas paragraph 13 of Mr. Mullin's affidavit has to

20   some degree a variation.  He refers to sodium thiopental first

21   in the left arm, then vecuronium bromide in the right arm, and

22   then potassium chloride in the left arm and then potassium

23   chloride again in the right arm and then sodium thiopental in

24   the left arm and vecuronium bromide in the right arm.

25        So that's a bit of an elaboration or, if you will, a

1  variation from the protocol that appears at the website.  Is

2  that the difference that you're making reference to?

3          MR. HANKINS:  That's one of them, Your Honor.  And as

4  far as I know, Oklahoma is the only state in the country that

5  does it that way.  And that's part of the problem we're

6  alleging.

7          THE COURT:  So there's one, two, three, four, five,

8  six steps according to Mr. Mullin's affidavit?

9          MR. HANKINS:  Correct.  And I believe the weights,

10  the specific amounts of the drugs are not contained anywhere

11  either in published cases, state statutes, or Department of

12  Corrections websites either.

13          THE COURT:  What's the other difference then?

14          MR. HANKINS:  The other difference between?

15          THE COURT:  Between the website protocol versus the

16  protocol described in paragraph 13 of Mr. Mullin's affidavit.

17          MR. HANKINS:  I believe there are some.  I don't know

18  them.  Ms. McCalmont can inform the Court on that.

19          THE COURT:  Okay.  Back to the subject immediately at

20  hand and that is the standard to be applied.

21          MR. HANKINS:  Your Honor, I can take some solace in

22  the fact that I think the Tenth Circuit missed that standard as

23  well in their order of May 30th and that's kind of what I took

24  my cue from as far as standards.  The case I cited in my papers

25  is the Wyandotte Nation, the syllabus case that sets out the

1   standard and that was a most recent published authority from

2   the Circuit and that was filed April 7th of this year.

3       If there is authority for a more relaxed standard,

4   obviously, I have not provided cases to the Court containing

5   that standard and clearly I believe I would advocate the Court

6   apply a less rigorous standard as provided by law.

7       One thing, on page 8 of the Tenth Circuit's order -- and

8   I'm referring to the amended order denying stay of execution

9   filed May 30, 2006.  In the second paragraph of the second

10  sentence, the Circuit states we do not know exactly what the

11  content of --

12          THE COURT:  Excuse me.  What page are you on?

13          MR. HANKINS:  Page 8, Your Honor.

14          THE COURT:  Okay.

15          MR. HANKINS:  The first full paragraph, second

16  sentence.  And that kind of reaffirms, I believe, the

17  discussion that the Court had with counsel for the state when

18  the Circuit says we do not know exactly what the content of the

19  thus far only broadly posited Section 1983 case might be.

20      And the distinction, Your Honor, is this proceeding is --

21  or at least one of the components is fact intensive.  The

22  Circuit -- I did not present them with all of the factual

23  materials that I had that are present in this Court, nor some

24  of the factual material that the Court is -- of which the Court

25  is aware that I'm not even aware that has been presented

1   through the discovery process in the Anderson and Taylor cases,

2   some of which is under seal or subject to protective order and

3   not available to Mr. Boltz.

4       So to the extent that a more relaxed standard applies, and

5   the Circuit didn't apply it, I think that's another reason for

6   this Court to take this order from the Circuit with a grain of

7   salt if the Circuit misapplied the standard, not to mention the

8   fact that it's completely --

9           THE COURT:  Well, that falls on pretty deaf ears when

10  you're asking me to take an order from the Court of Appeals

11  with a grain of salt.

12          MR. HANKINS:  Well, the main point of that is --

13          THE COURT:  Now, you can distinguish it, if you'd

14  like, but don't ask me to take it with a grain of salt.

15          MR. HANKINS:  Well, I only say that because the issue

16  is completely different in my opinion and I would ask the Court

17  to treat the issue addressed by the Circuit as a stay of the

18  specific issue of construction of the federal statute

19  concerning funding of appointed lawyers.  That's the question

20  that was before the Circuit, that's the issue I raised in my

21  moving papers, and that's the issue they addressed.  So rather

22  not taking it with a grain of salt, I would ask the Court not

23  give it persuasive authority in this case in this hearing.

24          THE COURT:  Thank you.  Counsel certainly must have

25  guidance from the Court as to the standard which will be

1  applied by the Court in determining the motion that is before

2  the Court today, which I have said and will emphasize is only a

3  motion for a temporary restraining order.   There are weighty

4  considerations on both sides.   There are good arguments as to

5  why the U.S. Supreme Court's decision in Nelson v. Campbell

6  should be dispositive today.

7       There are also good arguments which interlock with the

8  Nelson v. Campbell considerations as to whether or not the

9  Court ought to apply the more conventional and more lenient

10 standard which has been articulated in a good many Tenth

11 Circuit cases as I have described them.

12      And I won't repeat the conventional provisional relief

13 test.   It's familiar to all counsel.   The relaxed version of

14 that test, as I have said, applies where absent the application

15 of the principles set forth by the Supreme Court in Nelson v.

16 Campbell, the movant shows that the issues are so serious,

17 substantial, difficult, and doubtful as to make them fair

18 ground for litigation.   That's easier to say perhaps than to

19 apply.

20      We have a relatively recent elaboration on that standard

21 in the Tenth Circuit's decision in the Star Fuel Marts case,

22 362 F.3d 639, at page 653, where the Court said, and I quote,

23 "The Tenth Circuit has adopted the Second Circuit's liberal

24 definition of probability of success.   Accordingly, where the

25 moving party has established that the three harm factors tip

1 decidedly in its favor, the probability of success requirement

2 is relaxed.   In such cases the movant need only show questions

3 going to the merits so serious, substantial, difficult, and

4 doubtful as to make them a fair ground for litigation."

5   That echoes similar language as to fair ground for

6 litigation in the case of Resolution Trust Corporation v.

7 Cruse, 972 F.2d 1195, at page 1199, a Tenth Circuit decision

8 from 1992.

9   In Nelson v. Campbell, the Supreme Court had before it the

10 petitioner's request for a temporary stay of execution which

11 had been recharacterized by the petitioner as a request for a

12 preliminary injunction as discussed on page 647 of Volume 541

13 of the United States Reports.

14   In that case the petitioner was likewise challenging the

15 method of implementation of lethal injection and specifically

16 he was challenging the proposed use of the cut-down procedure

17 of getting access to his veins which were compromised because

18 of his very substantial drug use.

19   The Supreme Court articulated the very powerful concerns

20 and the resulting equitable test which the Court should apply

21 in the passage on pages 649 and 650 from which I read earlier.

22 The result of which is that this Court must certainly consider

23 the possibility of last-minute manipulation by the plaintiff in

24 bringing this action at this date and must consider that as

25 being -- as representing a significant counter-veiling

1  consideration counseling against the grant of provisional

2  relief in this case.

3      The effect of the application of the Nelson v. Campbell

4  standards in this case is, I believe, a close question.  I have

5  reputable counsel before me who has given me some reasons that

6  I do not dismiss out of hand for the delay in bringing this

7  action.  It is a fact that there has been and to this day is

8  not a provision in place for this plaintiff to obtain effective

9  assistance of counsel at least on a compensated basis.

10      It is also a fact -- and this does have a significant

11  bearing on my consideration of the matter.  It is also a fact

12  that the development of the factual and legal basis for the

13  present challenge to the lethal injection protocol is indeed a

14  relatively recent development.  There may be one or two cases

15  that go back a few years, but overall this is a relatively

16  recent development.  It is not a matter that I could with a

17  straight face say should have been raised on the basis of

18  existing factual and legal development ten to 15 years ago.

19      The state does complain most emphatically, not

20  exclusively, but most emphatically of the delay since

21  certiorari was denied in this case on March 27, 2006, by the

22  United States Supreme Court.  Measured against that standard

23  and viewing it in that light as a matter involving delay from

24  late March until late May, the delay is not as egregious as it

25  might otherwise seem to be.

1    There is also perhaps a potential issue as to ripeness
2  where the challenge is mounted before an execution date is
3  set.   And I certainly don't address that issue on its merits,
4  but that is potentially a consideration that could have a
5  bearing on the reasoning of counsel.
6    I do apply the Nelson v. Campbell considerations.   They
7  are very unequivocally stated by the Supreme Court.   I do note,
8  however, that the Supreme Court, although speaking emphatically
9  in Nelson v. Campbell, did not speak categorically.   Seldom can
10  any court speak categorically where the issues before the Court
11  require, as they do here, traditional equitable balancing.
12    And the Supreme Court begins its key passage in Nelson v.
13  Campbell with a statement that a stay is an equitable remedy.
14  It is clear that we are notwithstanding the emphatic statement
15  by the Supreme Court in Nelson v. Campbell, nevertheless, in an
16  equitable balancing context, although with powerful
17  considerations applicable that are not commonly applicable in
18  other contexts.   So I do apply and I do not disregard the
19  Nelson v. Campbell considerations.
20    In applying the Nelson v. Campbell considerations and
21  reconciling those considerations to the maximum extent possible
22  with the traditional four-element test with the relaxed final
23  element if the issues are so serious, substantial, difficult,
24  and doubtful as to make them a fair ground for litigation, it
25  is my conclusion that the Nelson v. Campbell holding and the

1   test articulated in Nelson v. Campbell, does not require denial

2   out of hand of the relief sought by this plaintiff today.

3        Those considerations remain very much alive and those

4   considerations may yet have an impact on the Court's action

5   today.  But it is my conclusion they do not require out of hand

6   denial of the relief sought by this plaintiff today and that

7   the fundamental standard to be applied by the Court, not free

8   of influence by the considerations set forth in Nelson v.

9   Campbell, to be sure, is the more lenient standard to which the

10  Court has already made reference.

11       Viewing the matter in that light, I will now invite

12  Mr. Hankins to the lectern to advise the Court as to what

13  evidence, if any, the plaintiff proposes to present in this

14  matter today.

15            MR. HANKINS:  Your Honor, concerning the evidentiary

16  presentation, I would ask the Court to consider the documents

17  that I filed with the pleadings, the initial pleading,

18  supplement, and then I filed a second supplement this morning.

19  I would also ask the Court to consider some of the documents --

20  there are many of them.  Do you want me to go through a list of

21  them?  Or I was going to have Ms. -- with the Court's

22  permission, invite Ms. McCalmont to make an evidentiary

23  presentation and we have copies of the very numerous documents

24  that we have.

25            THE COURT:  Well --

1          MR. HANKINS:  I mean, there are affidavits.  There

2    are -- from veterinarians.  There's an affidavit from

3    Mr. Mullin that the Court has reviewed.  There are the -- some

4    of the other pleadings.  It's just there's quite a bit of it.

5          THE COURT:  Tell me just a bit more about your

6    contemplated presentation by counsel for the amici.

7          MR. HANKINS:   I believe she can outline for the Court

8    the -- just in summary form the specific issues in the civil

9    rights case.  Deliberate indifference, the Eighth Amendment

10   violation, and then precisely the protocols in place in

11   Oklahoma that are deficient and violate those -- violate the

12   Constitution and the federal statute.

13         THE COURT:  And how long does this presentation take?

14         MR. HANKINS:   I believe it will be about 30 minutes.

15         THE COURT:  Mr. Draper, it's my inclination to

16   receive that as a proffer, subject to any commentary after it's

17   presented on behalf of the defendants, which would in any

18   particular respects take issue with that proffer.  What says

19   the state as to that procedure?

20         MR. DRAPER:  I'm sorry, Your Honor, I'm not sure I

21   understood your last question.

22         THE COURT:  Well, Ms. McCalmont is here as counsel

23   for amici.  She is not presented as a witness.  The evidentiary

24   rules to be applied in this proceeding are to some degree a bit

25   more relaxed than they would be in a normal proceeding,

1    particularly one with a jury in the box.  But in fairness, I

2    don't believe that I should permit Ms. McCalmont's presentation

3    to rise to any higher dignity than that of a proffer.  And by

4    that I mean that I am inclined to receive it for whatever

5    facial value it might have, subject to any critique the state

6    may have as to any particular portions of it, which the state

7    simply finds to be factually erroneous, which would

8    substantially undercut the degree to which I would rely on it

9    in those respects.

10           MR. DRAPER:  Well, Your Honor, I guess that due to

11   the nature of this case, we have a pending execution date for

12   six o'clock p.m., I'm concerned about viewing a discussion from

13   Ms. McCalmont for half an hour when I believe that the

14   materials provided to Your Honor by plaintiff as attachments in

15   this case will basically -- I guess I'm saying that I believe

16   Ms. McCalmont's presentation will be cumulative of those

17   materials.  Your Honor has had an opportunity to look at those

18   materials.

19           THE COURT:  I have.

20           MR. DRAPER:  And I would ask that Your Honor make his

21   decision based on that as soon as possible so that whatever

22   necessary action needs to happen can happen today.

23           THE COURT:  Okay.

24           MR. DRAPER:  Thank you, Your Honor.

25           THE COURT:  Well, Mr. Draper, not so fast.  That

```
 1   suggestion is not without appeal.  May I assume correctly that
 2   you don't take issue with the matters set forth in Mr. Mullin's
 3   affidavit?
 4            MR. DRAPER:  No, Your Honor.
 5            THE COURT:  I may not assume that?
 6            MR. DRAPER:  No, I do not take issue with that, Your
 7   Honor.  Sorry.
 8            THE COURT:  Okay.  Now, how does the protocol for the
 9   lethal injection scheduled to take place five hours and ten
10   minutes from now square with the protocol set forth in
11   paragraph 13 of Mr. Mullin's affidavit?
12            MR. DRAPER:  My understanding that's the same
13   protocol being used.  I'm informed, Your Honor, from a
14   representative of the Department of Corrections that the
15   protocol is what is found on the website.  That is the protocol
16   that will be followed tonight, the one that's posted, and I
17   believe that's already before Your Honor as one of the
18   attachments from plaintiff.
19            THE COURT:  So that's a three-step as opposed to a
20   six-step injection procedure?
21            MR. DRAPER:  May I have one moment, Your Honor?
22            THE COURT:  You surely may.
23            MR. DRAPER:  I apologize for the delay, Your Honor.
24   I've been informed that Mr. Mullin's affidavit is -- it is the
25   correct protocol and it does comport with the protocol that's
```

1   listed on the website.  It's the administration of the three

2   drugs listed repeated one time.  So two applications of each

3   chemical with saline washes in between each application.

4           THE COURT:  Is the plaintiff's counsel in a position

5   to gainsay that representation to the Court?

6           MR. HANKINS:  Your Honor, can Ms. McCalmont address

7   that issue?

8           THE COURT:  On behalf of the amici you're welcome to.

9           MS. McCALMONT:  Thank you, Your Honor.  I apologize.

10  I don't understand Your Honor's question, if we can gainsay

11  the --

12          THE COURT:  Well, I should perhaps say are

13  plaintiff's counsel in a position to dispute that

14  representation to the Court?

15          MS. McCALMONT:  No.

16          THE COURT:  Okay.  Thank you.

17          MS. McCALMONT:  However, I would just clarify, Your

18  Honor, that Warden Mullin's application is -- or affidavit is

19  the affidavit that forms the basis of the complaint and the

20  allegations of multiple uses of IV lines and unnecessary

21  repetition of drugs and drug amounts are -- Warden Mullin's

22  affidavit is the source of those allegations, so it is the very

23  matter in issue.

24          THE COURT:  Thank you.  Mr. Hankins, you heard my

25  dialogue with Mr. Draper on the question of whether I should do

1  anything other than restrain the use of the challenged
2  protocol.  My concern being that the Court perhaps ought to be
3  very wary about granting relief against execution as such, lest
4  it grant more relief than that which is requested in the
5  complaint.  I need to hear from you as to whether there's any
6  reason that the Court should grant relief beyond restraint of
7  the use of the challenged protocol.
8         MR. HANKINS:  That's correct, Your Honor.  We're
9  asking to -- for an injunction from the Court to enjoin the
10  execution under the specific protocol contained in the
11  affidavit, not to invalidate the statute that authorizes lethal
12  injection as a method of execution.  We have no constitutional
13  objection in the abstract to the lethal injection as a method
14  of execution in this state and do not ask the Court to hold
15  that the statute violates the Eighth Amendment or the
16  Fourteenth Amendment.
17         THE COURT:  You may not have understood my question.
18  Does the plaintiff seek an order restraining his execution
19  today regardless of the means by which that is to be
20  accomplished?
21         MR. HANKINS:  Not necessarily, Your Honor.  The
22  plaintiff would not object if there could be medical
23  professionals and qualified personnel to be present during the
24  execution with authority to either stop it or intervene
25  concerning the administration of the drugs.  If that could be

1    accomplished --

2         THE COURT:  Well, that's a cluster of issues that has

3    been involved in some other cases around the country, which is

4    not really a matter that the Court is in a position to address

5    in any meaningful way today.  Because that could be regarded as

6    a -- albeit a back door approach, a back door approach to a

7    frontal attack on lethal injection per se, and that's not an

8    attractive approach for a grant of provisional relief today,

9    but I think I understand your position.

10        Mr. Draper, if I take the record before the Court, that's

11   presently before the Court, in which you have invited the Court

12   to take as the factual record in lieu of the proposed

13   presentation on behalf of Ms. McCalmont, I want to hear from

14   you as -- and again, aside from the Nelson v. Campbell

15   considerations, I need to hear from the state as to the

16   reasons, if any, for which the Court should not regard the

17   issues presented on their merits as being so serious,

18   substantial, difficult, and doubtful as to make them a fair

19   ground for litigation either within the confines of this case

20   or taking into account the other cases in other jurisdictions

21   which have indeed regarded these matters as fair ground for

22   litigation.  I need to hear from you on that point.

23        MR. DRAPER:  Well, Your Honor, I think as far as

24   other cases go across the country, there have been cases where

25   stays have been entered in similar issues and cases where

1    executions have been allowed to go forward.  I don't think

2    there's any consensus.  I don't think that the fact that other

3    courts have chosen to make a stay is necessarily any more

4    persuasive than the courts have chosen not to grant stays and

5    have allowed executions to go forward.

6         As far as -- I sort of lost my train of thought, Your

7    Honor.  I'm sorry.

8              THE COURT:  Wait until you're 58 years old.

9              MR. DRAPER:  I was curious what your overarching

10   question was again.  If you could refresh me, please.

11             THE COURT:  My overarching question is this.  Aside

12   from the considerations quite emphatically articulated by the

13   Supreme Court in Nelson v. Campbell, what would you propose to

14   the Court as your reasons, if any, for which at base I should

15   not regard the issues presented by the plaintiff in this case

16   as being fair ground for litigation within the meaning of the

17   relaxed provisional relief standard to which I have referred

18   several times today?

19             MR. DRAPER:  Well, I believe that -- first off, Your

20   Honor, I have a couple of exhibits that I would like to offer

21   that would go directly to a couple of the issues that are

22   brought up in the materials that have been filed with you.

23             THE COURT:  That's --

24             MR. DRAPER:  If I may approach.

25             THE COURT:  That's certainly fair.  If you'll give

1  those to the clerk, please.

2      MR. DRAPER:  And, Your Honor, I have attached as --

3  or presented to you as Exhibit 1 a case, In re Williams, from

4  the Sixth Circuit which tends to discredit the doctor,

5  Dr. Heath, whose affidavit has been presented to this Court and

6  I've highlighted a portion on page 814 which is a concurring

7  opinion by Chief Judge Suhrheinrich, I think is how you say it,

8  where he quotes an affidavit presented to a Ohio court by

9  Dr. Heath wherein Dr. Heath says, in essence, if Ohio would

10  only do it the way Oklahoma does it, it would be okay.

11      And I suggest that that calls into question Dr. Heath's

12  veracity in front of the many courts in which he has appeared

13  and suggests that his purpose is really to manipulate and to

14  avoid death sentences for individuals rather than to present a

15  coherent and standard of medical practice as far as he's

16  concerned.  Of course, the state does not suggest that an

17  execution is a medical practice.  It's an execution.

18      The second thing, as Exhibit Number 2, is a disclaimer

19  from the American Veterinary Medical Association.  That

20  disclaimer is now attached to the front of their report on

21  euthanasia from the year 2000.  And that disclaimer has been

22  attached because the American Veterinary Medical Association

23  has been so concerned that death penalty opponents have used

24  that -- used their report in a way which is not accurate in a

25  manner to try to avoid death sentences for people.

```
 1        That disclaimer, I had to pull that off the Internet
 2   today, Your Honor.  It can be found at
 3   WWW.avma.org\issues\NA_welfare\euthanasia.pdf.  And that has
 4   been attached by that association to their report to try to
 5   stem the use of their report to apply the report to executions
 6   in the United States.  They say that that report really is only
 7   applicable to euthanasia in animals.
 8        THE COURT:  Thank you.  Mr. Hankins, bearing in mind
 9   the lenience with which I have enabled you to make your record
10   and bearing in mind also the less than stringent approach to
11   evidentiary matters commonly applied in proceedings like this
12   one, does the plaintiff have any objection to the state's offer
13   of these two exhibits?
14        MR. HANKINS:  No, Your Honor.
15        THE COURT:  Very well.  They'll be received as
16   Defendant's Exhibits 1 and 2.
17        Anything further on this point, Mr. Draper?
18        MR. DRAPER:  No, Your Honor.  Thank you.
19        THE COURT:  Does either side have anything further to
20   present aside from the suggestion of the presentation by
21   Ms. McCalmont before the Court rules on the pending motion?
22        MR. HANKINS:  Yes, Your Honor.
23        THE COURT:  What would you have to present besides
24   Ms. McCalmont's presentation?
25        MR. HANKINS:  Well, direct rebuttal to the
```

1   introduction of the exhibits.

2          THE COURT:  Okay.  I'll hear you on that.

3          MR. HANKINS:  May Ms. McCalmont present --

4          THE COURT:  I'll hear from the amici on that.

5          MS. McCALMONT:  Thank you, Your Honor.  Separate and

6   apart from any presentation which discusses the likelihood of

7   success on the merits of the lethal injection complaint filed

8   on behalf of Plaintiffs Anderson and Taylor, I would like to

9   briefly address the two exhibits that the defendants have

10  raised.

11      First, I would draw the Court's attention to the case In

12  re Williams in which counsel has mentioned Dr. Heath referred

13  with some approval to the Oklahoma statute.  I would draw the

14  Court's attention to the citation to the continuous intravenous

15  administration of an ultra short-acting barbiturate.  That is

16  in fact Oklahoma statute.  That is not in fact how Oklahoma

17  actually administers its lethal injection drugs.  And the

18  distinction between a continuous administration of an ultra

19  short-acting barbiturate and a bolus dose is quite --

20          THE COURT:  A what dose?

21          MS. McCALMONT:  A bolus dose.  A pill or a slug

22  through a syringe as opposed to continuous IV administration is

23  quite significant with a drug like thiopental, which is both

24  ultra short-acting and capable of being ultra short in duration

25  if it's not administered correctly.

1        And Dr. Heath adequately addresses that in the affidavit

2   you have before you and notes the distinction between a

3   continuous administration which he cites with approval in this

4   legal opinion versus the method of execution that Oklahoma

5   currently employs in Warden Mullins' affidavit.

6        Second, I'd like to address the question of the

7   applicability of the AVMA report on euthanasia.  If I may, I

8   would like to provide the Court with a copy of the full

9   report.  May I approach?

10        THE COURT:  Very well.  This would be Plaintiff's

11   Exhibit 1?

12        MS. McCALMONT:  Your Honor, I put it as an amici

13   exhibit --

14        THE COURT:  Amici Exhibit 1.  Bearing in mind the

15   same considerations, Mr. Draper, and bearing in mind also that

16   you have provided the Court with an addendum to this report, do

17   the defendants have any objection to the admission of Amici

18   Exhibit 1?

19        MR. DRAPER:  No objection, Your Honor.

20        THE COURT:  It is received.  Go ahead.

21        MS. McCALMONT:  Thank you.  The American Veterinary

22   Medical Association has recently issued the statement that

23   counsel referred to expressing concern in how lawyers are using

24   their euthanasia standards to analogize the lethal injection.

25   There are some considerations in other jurisdictions that might

1    make the AVMA standards inapplicable, but those do not apply in

2    Oklahoma.

3        The specific prohibition that we refer to in Oklahoma in

4    our complaint is on page 680 of the AVMA protocol, which is the

5    prohibition against a combination of pentobarbital and a

6    neuromuscular blocking agent as not being an acceptable

7    combination of euthanasia agents.

8        The AVMA raises this prohibition because of their concern

9    in the application of a drug called T61, which is also

10   referenced on this page on the right-hand column of this page.

11   That was a euthanasia agent that veterinary surgeons attempted

12   to use in the United States for a period of time which combined

13   a barbiturate anesthetic and a neuromuscular blocking agent in

14   the same syringe.

15       They found that they were concerned about their ability to

16   control the rate and timing of the onset of those separate

17   drugs.  When they're combined in the same syringe, the concern

18   is the neuromuscular blocker agent will start to paralyze the

19   body and stop voluntary respirations before the barbiturate

20   anesthetic actually takes effect and renders the patient

21   unconscious.

22       When you have a single line method of drug delivery and

23   you have a sequential administration of a barbiturate

24   anesthetic and then followed by a neuromuscular blocking agent,

25   this concern is not as prominent.  But in Oklahoma where you

1    use a two-line method of drug administration, where the

2    thiopental moves in one arm and the neuromuscular blocking

3    agent moves in another, it has the effect in the body of

4    combining those drugs at the same time in the body.  Regardless

5    of the sequential administration in opposite arms, it has the

6    potential to impair the rate and timing of onset of those

7    drugs, just as the AVMA had prohibited in this standard.

8            And possibly more importantly, on page 681, the AVMA

9    expressly prohibits death by potassium chloride without the

10   assessment, the manual assessment of a surgical plane of

11   anesthesia prior to the administration of --

12           THE COURT:  Manual assessment of what?

13           MS. McCALMONT:  Of the surgical plane of anesthesia

14   prior to the administration of the killing agent potassium

15   chloride.  In lethal injections in the United States I think it

16   has been well proven in the Morales litigation in California as

17   well as elsewhere that potassium chloride is the killing

18   agent.  That evidence, I think, is also corroborated in

19   Oklahoma executions where time of death is always noted after

20   the administration of potassium chloride.

21           Since potassium chloride is the killing agent, it directly

22   contravenes the AVMA policy here that there is no assessment of

23   a surgical plane of anesthesia before proceeding with the

24   extraordinarily painful application of potassium chloride.

25           THE COURT:  Thank you.

1          MS. McCALMONT:   So in all respects the AVMA is, in

2    fact, the most appropriate standard in addition to the

3    standards offered by the American Society of Anesthesiologists,

4    which also say prior to the use of any neuromuscular blocking

5    agent, one must have the assessment by clinical modalities of

6    the plane of anesthesia in which the patient is placed.

7          And, importantly, the AVMA also has a caveat on their

8    website which addresses the question of what you should do if

9    you are interested in applying the AVMA standards in any

10   context outside the AVMA euthanasia.   And they say get yourself

11   a veterinary anesthesiologist and ask his opinion about the

12   applicability of these standards to your situation.   And, of

13   course, plaintiffs have done that, because they have the

14   affidavit of veterinary anesthesiologist Ken Cannon before the

15   Court, which talks about the applicability of these standards

16   to the lethal injection context and the requirement of careful

17   assessment of the depth of anesthesia prior to proceeding with

18   death by potassium chloride.

19          THE COURT:   Thank you.   Again, bearing in mind that

20   the plaintiff has proposed the presentation of the Power Point

21   presentation by Ms. McCalmont, and aside from that, does either

22   party have anything further to present before the Court rules

23   on the motion?

24          MR. DRAPER:   No, Your Honor.

25          MR. HANKINS:   No, Your Honor.

1          THE COURT:  It will not be necessary to receive the

2    Power Point presentation proposed by the plaintiff.  The

3    plaintiff in this case has alleged that his injury will consist

4    of conscious suffering and pain by the condemned inmate, which

5    he asserts he will suffer during his execution if the State of

6    Oklahoma proceeds with its execution by the proposed lethal

7    injection protocol.

8          He alleges that the protocol does not, in fact, result in

9    a quick, painless death, but rather implementation of the

10   protocol carries a very high risk that he will be paralyzed

11   during the process and suffer excruciating pain while being

12   unable to communicate or move.

13         He further asserts that there is, in fact, a significant

14   risk of agonizing and prolonged pain during the execution

15   process which will deprive him of his rights under the Fifth,

16   Eighth, and Fourteenth Amendments to the Constitution to be

17   free from cruel and unusual punishment.

18         The Court need not elaborate at great length in this case

19   on the fact that when we talk about irreparable injury,

20   although the Court of Appeals has addressed the question of

21   irreparable injury in its May 30th opinion and has commented on

22   its approach to that issue, in this case now that we do have a

23   Section 1983 action pending and in this case now that we do

24   have an execution set to occur less than six hours from now,

25   the Court is led to the conclusion that we do have irreparable

1  injury in prospect consisting of an injury occurring during the

2  execution of the plaintiff.

3      The Court therefore concludes that the first requirement

4  for provisional relief, irreparable injury has been established

5  and that this factor does weigh in favor of granting temporary

6  relief.

7      I've already alluded to the nature of the injury which the

8  plaintiff asserts he will suffer.  Balanced against that

9  alleged physical injury is the injury which would be incurred

10  by the state as a result of the granting of temporary relief.

11      The primary injury which the state will suffer in the

12  event a restraining order is entered is a delay in the

13  execution of the plaintiff's sentence and the burdens and costs

14  associated with that delay.

15      On the other hand, if the Court ultimately determines this

16  action in favor of the plaintiff, then the state's interest in

17  the constitutional execution of its condemned criminals is

18  served and that also is an important state interest.

19      For these reasons, the Court concludes that in these

20  circumstances the threatened injury to the plaintiff outweighs

21  the damage which a grant of temporary relief might cause to the

22  state so that the second requirement for temporary injunctive

23  relief is met.

24      The public does have an interest -- turning now to the

25  third consideration, which the Court has previously

1   articulated.   The public does have an interest in the

2   expeditious carrying out of sentences of execution, and that is

3   indeed a weighty interest as has been articulated very well by

4   counsel for the defendants as well as the Supreme Court and the

5   Tenth Circuit Court of Appeals.

6        The public also has an interest in issues such as those

7   raised in this case being raised in a timely manner rather than

8   on the eve of execution, as is the case here, so that the

9   issues may be resolved in as orderly and as considered a manner

10  as is possible.

11       As recognized by the Tenth Circuit Court of Appeals in its

12  May 30th amended order denying stay, the state does very much

13  have an interest in the timely carrying out of its final

14  criminal judgments and the public has an interest in a criminal

15  justice system which works as prescribed by its elected

16  representatives without manipulative disruptions caused by

17  eleventh hour claims which could have been asserted earlier.

18  These general public interests are indeed substantial.

19       Furthermore, I am very mindful of the fact that if

20  injunctive relief is granted the family of the victim of

21  Mr. Boltz's crime will suffer the inevitable trauma of a last-

22  minute delayed execution.   Those interests are so substantial

23  that as previously noted the Supreme Court has stated that the

24  district court "must consider the extent to which the inmate

25  has delayed unnecessarily in bringing the claim."   That's from

1    page 649 and 650 of the Nelson v. Campbell opinion.

2        The public also has an interest, however, in the

3    constitutional execution of its condemned criminals, as I have

4    already said.   In this case, the plaintiff has advanced several

5    arguments as to why this action is not a last-minute

6    manipulation, as I have previously described.

7        Whether or not the Court finds this action to involve

8    last-minute manipulation, I am indeed influenced by the

9    public's considerable interest in the constitutionality of --

10   or the constitutional administration of its execution protocols

11   and the public's interest in expeditious administration of

12   capital punishment as has been upheld in this case in

13   particular as well as in general under the Oklahoma statutory

14   scheme for the administration of capital punishment.

15       I do find and conclude that the third requirement for

16   temporary relief is met because the grant of temporary relief,

17   and the emphasis here is on temporary for reasons I will

18   describe in a moment, is not adverse to the public interest.

19       Having found that the plaintiff has satisfied the first

20   three requirements for temporary relief, the Court does apply a

21   more lenient standard with regard to the fourth requirement, as

22   has previously been discussed.   The application of that

23   standard, however, and the balancing which must nevertheless

24   take place in applying that standard is most assuredly tempered

25   by the concerns in the passage on pages 649 and 650 of Nelson

1   v. Campbell.   That passage certainly does articulate very

2   weighty concerns which do weigh heavily on the Court's

3   consideration of the matter.

4        Applying the more lenient Tenth Circuit standard on its

5   face, it is the Court's conclusion that the plaintiff need only

6   show that the issues are so serious, substantial, difficult,

7   and doubtful as to make them fair ground for litigation.

8   Issues involving protocols for execution are to say no more

9   extremely serious.   It is my conclusion that we do have here

10  substantial issues which are fair ground for litigation.   They

11  are difficult and doubtful, as evidenced by the differences of

12  opinion expressed by other courts, state and federal, in

13  decisions which have recently considered those issues.

14       And in that respect, I would refer counsel to some more

15  recent juris prudence from the Sixth Circuit in Alley v.

16  Little, 2006 Westlaw 1313365, and the dissent to the en banc

17  hearing in that case at 2006 Westlaw 1320433.

18       Having considered all the matters presented to the Court

19  and being aware in a general manner of the currently divided

20  views of other courts, state and federal, regarding the merit

21  of claims similar to those made by the plaintiff in this

22  action, I do conclude that the allegations made in this action

23  are fair ground for litigation.

24       I do conclude that the fourth requirement for temporary

25  injunctive relief is met and I do so bearing in mind, as I have

1    said, that weighing heavily in the balance are the equitable

2    considerations articulated by the Supreme Court in Nelson v.

3    Campbell.  And I would emphasize also that I regard the

4    application of and the controlling effect of the Nelson v.

5    Campbell considerations as being a close question.

6         I'm also influenced to some degree by the pendency of the

7    Hill v. McDonough case in the U.S. Supreme Court which may lend

8    considerable clarity, at least in some respects, to the issues

9    now before this Court in this case and perhaps also in the

10   Anderson case.

11        For that reason, bearing in mind that the only request

12   before the Court today that the Court is considering is a

13   request for a temporary restraining order, the defendants are

14   temporarily restrained pending the further order of the Court

15   from proceeding with the execution of the plaintiff.  This is

16   only a temporary restraining order.  The emphasis is on the

17   word "temporary."

18        The matter will be set for a hearing on a preliminary

19   injunction on June 28, 2006, at nine in the morning.  That's

20   June 28, 2006, at nine in the morning.

21        This temporary restraining order effective only until that

22   date will afford the parties an opportunity for at least a

23   minimally orderly presentation of and resolution by the Court

24   of the issues involved in this case.

25        At the June 28, 2006, hearing on the preliminary

1    injunction, I will hear any additional evidence and arguments

2    the parties may wish to present in support of and in opposition

3    to provisional relief and the parties can certainly assume that

4    I will recall the matters presented today.

5        Secondly, and I caution all counsel to bear this carefully

6    in mind, I will hear arguments as to whether the Court, if it

7    continues provisional relief in effect at all, should grant any

8    provisional relief other than the restraint of the use of the

9    challenged protocol involving the sequential injection of

10   sodium thiopental, vecuronium bromide, and potassium chloride.

11   And in this respect, it is to be carefully noted that the

12   plaintiff does not contest his execution in this action.

13       It seems to the Court that it is quite possible that

14   continuing restraint of the execution, which the Court does

15   today, as opposed to temporary restraint of execution using the

16   challenged protocol, would amount to a grant of provisional

17   relief in excess of that which plaintiff could obtain by way of

18   the final judgment in this case.  And that will be a matter to

19   be carefully considered at the hearing on June 28th.

20       The conclusion I reach today and the order that I enter

21   today do not constitute a resolution of plaintiff's claims on

22   their legal or factual merits and should certainly not be taken

23   by anyone as an indication as to what the Court's ultimate

24   disposition of the plaintiff's claims may be.

25       A major factor in the Court's ruling on the motion for

1   temporary restraining order is the relaxed standard for

2   provisional relief that I have discussed and have concluded is

3   applicable at this point in these proceedings, albeit tempered

4   by the considerations articulated by the Supreme Court in

5   Nelson v. Campbell.

6        The plaintiff asserts in this case that he has a

7   constitutional right to be spared a brief period of pain which

8   he asserts is unavoidable -- or which he asserts is avoidable,

9   I should say, and which he asserts under the Eighth Amendment

10  must not be inflicted.

11       Although it is legally irrelevant to today's proceedings,

12  the irony of plaintiff's claim in this case is not lost on this

13  Court.  The opinion of the Oklahoma Court of Criminal Appeals

14  in this case indicates that at the plaintiff's murder trial,

15  the evidence established through the testimony of Medical

16  Examiner Fred Jordan that, and I quote, "The autopsy of Doug

17  Kirby revealed a total of 11 wounds including eight stab wounds

18  to the neck, chest, and abdomen and three cutting wounds to the

19  neck.  One of the wounds to the neck was so deep that it had

20  cut into the spinal column.  The carotid arteries on both sides

21  of the neck were cut in half and the major arteries in the

22  heart were also cut."

23       The Court's grant of relief in this case today will serve

24  only the limited but important purpose of permitting the

25  orderly resolution of the claim asserted by the plaintiff.

1    The Court will enter a written order as soon as is

2 practicable memorializing the essential features of the Court's

3 ruling.  I urge the parties also to obtain a transcript as soon

4 as that can reasonably be obtained from the reporter.

5    The hearing on June 28th will certainly be aided by the

6 Court's receipt of additional briefing.  And the plaintiff is

7 granted until the 14th of June within which to file any brief

8 the plaintiff may choose to file in support of his request for

9 preliminary injunction to which the defendants may respond not

10 later than June 26th.

11    Is there anything further to come before the Court this

12 afternoon in this matter?

13       MR. DRAPER:  Your Honor, I'd just give the Court oral

14 notice that we are going to file a notice of appeal almost

15 immediately and would just ask the Court to get your order

16 filed as soon as possible, if that's possible.

17       THE COURT:  We'll certainly make every effort to do

18 that.  Anything further this afternoon from the plaintiff?

19       MR. HANKINS:  Your Honor, since I am pro bono, I

20 would ask for funds from the Court to -- or an order from the

21 Court to obtain a copy of the transcript of today's

22 proceedings.  Otherwise, I'll just pay for it.

23       THE COURT:  Pardon me?

24       MR. HANKINS:  I said, otherwise, I'll just pay for

25 it.

1          THE COURT:  Well, I don't want to consider that just

2    off the cuff.  A transcript will be made available.  You can

3    make arrangements for payment with the reporter and then I'll

4    consider a motion for reimbursement filed at the appropriate

5    time.  Court will be in recess.

6          (COURT ADJOURNED.)

7                    REPORTER'S CERTIFICATE

8

9          I HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT

     TRANSCRIPT OF PROCEEDINGS:

10

11

12                         _____
                           Tracy Washbourne, RMR, CRR

13                         United States Court Reporter
                           Western District of Oklahoma

14

15

16

17

18

19

20

21

22

23

24

25